**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Michael Gregg and Kathy Gregg ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | |
| ) | 20-cv-2821 |
| 175 East Delaware Place ) | |
| Homeowners Association and ) | |
| Sudler Property Management, ) | |
| ) | |
| Defendants ) | |

**COMPLAINT**

Plaintiffs Michael Gregg and Kathy Gregg, for their Complaint against Defendants 175 East Delaware Place Homeowners Association and Sudler Property Management, state as follows:

INTRODUCTION

1. Michael Gregg ("Mr. Gregg") and his wife Kathy (collectively "Plaintiffs" or the "Greggs") live at 175 E. Delaware Place in Chicago, Illinois, a condominium building. Mr. Gregg has a disability and uses an assistance animal, Boo ("Boo"), to ameliorate the effects of his disability.

2. The Greggs' building does not allow dogs. Because the Greggs' dog is an assistance animal, the Greggs asked the Defendants for permission to keep the dog in their unit as a reasonable accommodation under the federal Fair Housing Act. The Defendants approved the request subject to discriminatory conditions, including: limiting the routes Mr. Gregg would use to enter and exit the building with the dog; insisting Mr. Gregg provide annual certification of his disability and proof of current dog registration; and restricting whether residents can have

1

visitors with assistance animals. These discriminatory conditions constitute a denial of Mr. Gregg's reasonable accommodation request and violate the Fair Housing Act. To remedy Defendants' discriminatory conduct, the Greggs bring this action for declaratory and injunctive relief, as well as damages.

## PARTIES

3. Plaintiff Michael Gregg lives in the John Hancock building at 175 E. Delaware Place, Unit 8504, Chicago, Illinois 60611 ("subject property" or "building") with his wife, Kathy Gregg ("Ms. Gregg"). He has a disability. Ms. Gregg is a Plaintiff by virtue of her association with Mr. Gregg. 42 U.S.C. § 3604(f).

4. Defendant, 175 East Delaware Place Homeowners Association (the "Association") is the condominium association for the subject property. The Association is an Illinois Corporation.

5. Defendant, Sudler Property Management ("Sudler"), is the property management company for the subject property. Sudler is an Illinois Corporation.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and 42 U.S.C. § 3613(a). Plaintiffs' claims for declaratory and injunctive relief are authorized under 28 U.S.C. §§ 2201-02 and 42 U.S.C. § 3613(c)(1).

7. Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391(b) because Defendants reside there and because a substantial part of the events or omissions giving rise to Plaintiffs' claims arose there.

ASSISTANCE ANIMAL BACKGROUND

8. In 1968, Congress enacted the Fair Housing Act ("FHA"), prohibiting discrimination on the basis of race, gender, national origin, and religion in the provision of housing. In 1988, through the Fair Housing Amendments Act, Congress extended the law's protections to people with disabilities.

9. Under the FHA, it is unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a [disability][1] of . . . that buyer or renter." 42 U.S.C. § 3604(f)(1). Discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

10. One such accommodation is allowing an assistance animal in a building that has a no pets policy. The U.S. Department of Housing and Urban Development's regulations on reasonable accommodations under the FHA provide the following example.

> A blind applicant for rental housing wants live in a dwelling unit with a seeing eye dog. The building has a *no pets* policy. It is a violation of § 100.204 for the owner or manager of the apartment complex to refuse to permit the applicant to live in the apartment with a seeing eye dog because, without the seeing eye dog, the blind person will not have an equal opportunity to use and enjoy a dwelling.

24 C.F.R. § 100.204(b).

11. Assistance animal is an umbrella term that encompasses both service animals and emotional support animals. A service animal is "any dog that is individually trained to do work

---

[1] "Handicap," the term used in the Fair Housing Act, is disfavored. Disability has the same legal meaning.

or perform tasks for the benefit of an individual with a disability, including a physical, sensory, psychiatric, intellectual, or other mental disability." 24 C.F.R. § 35.104. An emotional support animal is an animal that provides therapeutic emotional support for individuals with disabilities. *Assessing a Person's Request to Have an Animal as a Reasonable Accommodation Under the Fair Housing Act* ("Assistance Animal Guidance"), Washington, D.C. (January 28, 2020), at 3, *available at* https://www.hud.gov/sites/dfiles/PA/documents/HUDAsstAnimalNC1-28-2020.pdf.

12. Under the federal Fair Housing Act, an assistance animal may go anywhere in a residential building that any resident, with our without a disability is allowed to go. Assistance Animal Guidance at 7; *See also e.g.* 28 C.F.R. 35.136(g); 28 C.F.R. § 36.302(7).

13. Under the federal Fair Housing Act, a landlord cannot place unreasonable conditions on approval of a reasonable accommodation. *Joint Statement of the Department of Housing and Urban Development and the Department of Justice – Reasonable Accommodations Under the Fair Housing Act,* "Joint Statement on Reasonable Accommodations," Washington, D.C. (March 17, 2004), p. 9 (Question 11), *available at:* http://www.hud.gov/offices/fheo/library/huddojstatement.pdf; *see also Joint Statement of the Department of Housing and Urban Development and the Department of Justice – Reasonable Modifications Under the Fair Housing Act* ("Joint Statement on Reasonable Modifications"), Washington, D.C. (March 5, 2008), p. 12 (Questions 21 and 22) *available at* https://www.hud.gov/sites/documents/reasonable_modifications_mar08.pdf. Such a condition constitutes a denial of the reasonable accommodation request. *See* Joint Statement on Reasonable Modifications, p. 12 (Questions 21 and 22).

## STATEMENT OF FACTS

14. The Greggs have lived in the building since June 2018.

15. The Amended and Restated Declaration of Condominium Ownership, Easements, Restrictions, Covenants, and By-Laws for 175 East Delaware Place, *attached as* Exhibit A ("Declaration") vests power in the Condominium Board "[t]o adopt and amend rules and regulations covering the details of the operation and use of the property as the board may deem advisable." Declaration at 14.

16. The Declaration states:

> No dog shall be brought upon or kept in the Property (including the Building, the Units, and the Common Elements) on either a temporary or permanent basis, by a Unit Owner, resident, occupant, tenant, or guest. Nothing in this subparagraph shall be construed to contravene any requirement of applicable law pertaining to handicapped or disabled persons.

Declaration at 26.

17. Mr. Gregg is a person living with anxiety and depression. Mr. Gregg also has lifting restrictions, mobility issues, and short-term memory loss due to a stroke.

18. Mr. Gregg's physician recommended an emotional support animal to alleviate the symptoms of his disability.

19. In or about April 2019, Mr. Gregg submitted a reasonable accommodation request to Defendants to keep a dog as an emotional support animal.

20. On April 11, 2019, Defendants responded that Mr. Gregg could keep an emotional support animal subject to the conditions listed in the Policy on Service/Therapy Dogs ("Policy"), a*ttached as* Exhibit B. Specifically, the Policy mandated several conditions, including:

- When the dog is brought into the building, it must be transported from the ground floor lobby to the 44th floor lobby via the southernmost passenger elevator (that is, passenger elevator #7), and then transported from the 44th floor to the handicapped resident's unit via a service elevator. Likewise, when the dog is brought out of the building, it must be transported from the handicapped resident's unit to the 44th floor via a service elevator, and then transported from the 44th floor to the ground

5

    floor lobby via the passenger elevator #7. (This is the same requirement applicable to the transport of bicycles into and out of residential units.)

- The dog must be hand-carried, carried in a cage or animal transporter, or tightly held on a short leash whenever the dog is on Association property, and not in the owner's own unit, especially in elevators and hallway corridors.

- The dog may not be in any common element area, other than when the dog is being brought into or out of the building. At no time may the dog be present in any amenity area (e.g. pool, exercise room, etc.)

- Except for short absences (that is, no more than 3 consecutive hours) whenever the handicapped person served by the dog is not in his/her unit, the dog may not be kept in the building and must be housed off-site.

21. That same month, the Greggs acquired an emotional support dog named Boo ("Boo"). Mr. Gregg relies on Boo to help him alleviate the symptoms of his anxiety and depression. In addition, Boo assists Mr. Gregg with his mobility when walking outside by helping him avoid objects and people in his path.

<u>Condominium Entrances and Elevators</u>

22. The building is bordered on the north by Delaware Place and on the south by Chestnut Street.

23. The main residential entrance to the building is on Delaware. To get to the Greggs' unit from the Delaware entrance, there are two sets of elevators: one to travel from the first floor to the 44th floor, and another from the 44th floor to the residential floors.

24. There is another residential entrance on Chestnut, which also serves as the commercial entrance to the building. It contains elevators to the building's professional floors and observation floor. The Chestnut lobby contains a hallway residents can access that leads to the residential passenger elevators on the Delaware side of the building. Residents may also access the parking garage through the Chestnut Street entrance.

25. There are three elevators from the first floor to the 44th floor. Per the Policy, people with assistance animals must only use the southernmost passenger elevator to get to the 44th floor (passenger elevator #7). The southernmost passenger elevator only works if the other two elevators are already in use, and thus there is often a long wait for that elevator. When Mr. Gregg needs to call the southernmost passenger elevator, he often needs to send the other elevators up before he can do so.

26. There are a total of six passenger elevators from the 44th floor to the residential units: four passenger elevators and two service elevators. Pursuant to the Policy, people with assistance animals cannot travel from the 44th floor to their units via the passenger elevators. Rather, they are restricted to the two service elevators. Upon arriving on the 44th floor from the first floor, residents with assistance animals must travel farther to reach the service elevators than to reach the passenger elevators. In addition, service elevators are often reserved during the workweek for moves, construction, or maintenance, or otherwise occupied by other residents in the building. Moreover, when on the 44th floor, to reach the service elevators residents have to open manual doors, one of which is heavy and hard to open, whereas to reach the passenger elevators, residents have the benefit of automated doors.

Alleged Policy Violations

27. On August 16, 2019, Boo had an accident in the service corridor on the 44th floor. Mr. and Mrs. Gregg immediately cleaned the area and no damage occurred.

28. On August 20, 2019, the Greggs received a letter from Defendants stating they would be charged for maintenance having to clean the service corridor after Boo's accident. *See* Letter from Marcin Wyka to Michael Gregg (August 20, 2019), *attached as* Exhibit C. The letter also alleged that one of the Greggs' visitors took Boo out of the building using one of the

passenger elevators. *Id.* The letter offered the Greggs a hearing on September 9, 2019 to review the matter.

29. At the hearing, the Greggs conceded that a visitor took Boo on a passenger elevator. Additionally, the Greggs stated cleaning costs should not be assessed because they took care of the cleaning immediately after the accident and no damage was done.

30. Defendants fined the Greggs for the two incidents.

### Correspondence with Condominium Association

31. On October 10, 2019, the Greggs, through their counsel, asked Defendants to amend their Service/Therapy Policy to comply with the Fair Housing Act, and to provide additional relief. In particular, counsel asked Defendants to:

- allow Boo in all areas where Mr. Gregg has the right to go;
- allow Boo to remain in the Gregg's unit with no time period restrictions, regardless of whether the Greggs are present in the unit;
- instruct the other residents that animals in the building are assistance animals and their owners should not be harassed or questioned;
- reimburse the Greggs for the fine of $100 charged to them for Boo using the passenger elevator; and
- reimburse the Greggs for the fine of $155 charged to them for Boo's accident.

Letter from Mary Rosenberg to Marcin Wyka (October 10, 2019) *attached as* Exhibit D.

32. Defendants were asked to let the Greggs' counsel know by October 20, 2019 whether Defendants were going to amend their Policy to comply with the Fair Housing Act and cease placing discriminatory conditions on the Greggs. Ex. D.

33. On November 21, 2019, counsel for the Condominium Association responded by letter that the Service/Therapy Policy was being revised. Letter from Laura Lau Marinelli to Mary Rosenberg (November 21, 2019), *attached as* Exhibit E. Moreover, the Association maintained that "[t]here is nothing unlawful about requiring the animal to utilize a designated elevator so long as the designated elevator allows the Greggs equal access to use and enjoy their dwelling, which it does." Exhibit E. Accordingly, the Association refused to reverse the fines related to use of the passenger elevator and Boo's accident.

34. On December 2, 2019, all residents received a notice from Marcin Wyka, Assistant Property Manager, stating that "all animals, other than seeing-eye dogs and other specially trained service animals, are prohibited in the commercial Chestnut Street lobby. Residents and their dog walkers are asked to comply with the commercial owner's rules with regards to animals in the commercial lobby." December 2019 Notice *attached as* Exhibit F.

35. On January 7, 2020 the Greggs, through their counsel, sent a follow-up letter to Defendants to inquire when exactly policy changes were going to be implemented. Letter from Mary Rosenberg to Laura Lau Marinelli (January 7, 2020), *attached as* Exhibit G. The letter also pointed out that the commercial entrance policy described in the December 2019 Notice violates the FHA because it restricts which routes a person with a disability can go with an assistance animal. Exhibit G.

36. The letter concluded by stating that Defendants had until January 14, 2020 to communicate when the Condominium Association would amend its Policy to comply with the Fair Housing Act. Exhibit G. Plaintiffs did not receive a response by January 14.

<u>Revised Policy</u>

37. On February 27, 2020, the Greggs received a letter from Ms. Wyka with a revised "Policy on Assistance Dogs." Revised Policy, a*ttached as* Exhibit H ("Revised Policy").

Changes to the policy included:

- A disabled Resident may be accompanied by the Resident's Assistance Animal in any common element area. However, in accordance with Illinois law[2], an Assistance Dog may not be brought into the swimming pool unless the Assistance Dog is a service animal that has been trained to perform a specific task or work in the water, and Assistance Dog's presence in the swimming pool does not pose a direct threat to the health and safety of pool users or to the function of sanitary conditions of the pool;

- Any waste deposited by an Assistance Dog anywhere on Association property must immediately be reported to the Management Office, and the Management Office will arrange for the affected area to [be] professionally cleaned and for the cost to be charged to the owner of the applicable unit;

- When an Assistance Dog is brought into or out of the building, it may be transported between the ground floor Delaware lobby and the 44th floor lobby via <u>any available passenger elevator car that is unoccupied</u> when the Assistance Dog enters the elevator (or any elevator car whose occupants affirmatively give their verbal agreement to the presence of the Assistance Dog in that elevator car). Assistance Dogs must be transported between the 44th floor lobby and the disabled Resident's unit (or other units) only via service elevator cars 32 and 33.

Exhibit H. (emphasis in original).

38. Moreover, the Revised Policy added additional requirements, including:

- Upon request made no more frequently than once in any 12-month period, the disabled Resident must provide the Management Office with (a) proof of a current City of Chicago dog registration permit for the Assistance Dog, and (b) written documentation reliably re-confirming the Resident's disability and disability-related need for an Assistance Dog.

---

[2] Presumably, the Revised Policy is referring to the Illinois Swimming Facility Act (210 ILCS § 125/32), which states:

> It is the duty of a licensee under this Act to allow the use of service animals as defined and prescribed in 28 C.F.R. 35.104, 28 C.F.R. 35.136, 28 C.F.R. 35.139, 28 C.F.R. 36.104, 28 C.F.R. 208, and 28 C.F.R. 302(c) if the service animal has been trained to perform a specific task or work in the water and the use of such animal does not pose a direct threat to the health and safety of the patrons of the facility or the function or sanitary conditions of the facility. Any use of a licensed swimming facility by an animal other than a service animal as authorized under this Section is prohibited.

- Except for absences of less than 48 consecutive hours, whenever the disabled Resident is not in his or her unit, the Resident's Assistance Dog may not be kept in the building and must be housed off-site.

- If a Resident is expecting a Visitor who is disabled and will need to be accompanied by an Assistance Dog, the Resident is requested to give not less than 48 hours' advance notice to the Management Office so that the door staff can be prepared for the disabled Visitor's arrival. Whether or not notice is given to the Management Office, the Resident being visited must: (a) instruct the disabled Visitor that upon arrival at the door station, the disabled Visitor must clearly and specifically advise the doorperson, without prompting, (1) that the Visitor is disabled, and (2) that the dog accompanying the Visitor is an Assistance Dog; and (b) go to the door station to personally escort the disabled Visitor to the Resident's unit.

    - If the disabled Visitor provides the required information to the doorperson and the Resident is present at the door station to personally escort the disabled Visitor to the Resident's unit, the Assistance Dog will be allowed to accompany the disabled Visitor to the Resident's unit, the Assistance Dog will be allowed to accompany the disabled Visitor into the building and remain in the building until 11:00 p.m. . . However, if the disabled Visitor fails to provide the required information . . . or if the Resident does not personally escort the disabled Visitor, the Assistance Dog may be denied entry into the building and fines may be imposed against the owner of the unit being visited.

- If a Resident is expecting a Houseguest who is disabled and will need to be accompanied by an Assistance Dog during his or her stay, the Resident being visited **must** seek and obtain a disability-based accommodation from the Association for the Houseguest.

Exhibit H. (emphasis in original).

39. Violations of any of these requirements can result in a fine, and multiple violations can result in revocation of permission to keep an Assistance Dog in the building. Exhibit H.

<u>Continued Harassment</u>

40. On March 11, 2020, the Greggs received a letter from Ms. Wyka that stated Mr. Gregg was in violation of the Revised Policy because he transported Boo from his unit to the 44th floor in a passenger elevator, rather than one of the two service elevators. The letter also stated that Mr. Gregg must attend a Rules Violations Committee hearing on May 5, 2020.

41. On March 13, 2020, the Greggs received a second letter from Ms. Wyka. It stated that on March 11, the doorperson on duty received a complaint from a resident that Mr. Gregg was transporting Boo from his unit to the 44th floor in a passenger elevator, not one of the two service elevators. Additionally, the letter outlined a conversation that took place between Mr. Gregg and the Property Manager about the Association's discriminatory rules. The letter again stated that Mr. Gregg would need to attend the May 5 Rules Violations Committee hearing.

42. On March 19, 2020, the Greggs received a letter from Ms. Wyka with another revised "Policy on Assistance Dogs." *attached as* Exhibit I. There was only one change made to the policy: that Residents who are transporting assistance animals can only use the 44th floor service corridor along with the two service elevators. The updated language stated that,

> [w]hen an Assistance Dog is brought into or out of the building, it may be transported between the ground floor Delaware lobby and the 44th floor lobby via any available passenger elevator car that is unoccupied when the Assistance Dog enters the elevator (or any elevator car whose occupants affirmatively give their verbal agreement to the presence of the Assistance Dog in that elevator car). Assistance Dogs must be transported between the 44th floor lobby and the disabled Resident's unit (or other units) only via the 44th floor service corridor and service elevator cars 32 and 33.

Exhibit I.

43. Defendants continue to enforce discriminatory policies against the Greggs.

44. Defendants continue to cite and impose fines against the Greggs for using the elevators and paths of their choice to enter and exit the building.

## DISCRIMINATION UNDER THE FAIR HOUSING ACT

### Count I: Failure to Make a Reasonable Accommodation

45. Plaintiffs re-allege and incorporate paragraphs 1-44 as if fully set forth herein.

46. Under the federal Fair Housing Act, it is unlawful, "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a

[disability] of . . . that buyer or renter." 42 U.S.C. § 3604(f)(1). Discrimination includes, "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

47. To place conditions on granting a reasonable accommodations has the effect of denying the accommodation, and violates the FHA. Joint Statement on Reasonable Accommodations p. 9, (Question 11); Joint Statement on Reasonable Modifications, p. 12 (Questions 21 and 22).

48. Defendants failed to accommodate Mr. Gregg when they placed discriminatory conditions on his request for an assistance animal, including but not limited to: limiting which routes the Greggs could take going in and out of the building, and limiting which parts of the building Mr. Gregg could be in with his assistance animal.

49. Defendants' failure to accommodate Mr. Gregg caused damages to Plaintiffs. In addition to the fines charged to the Greggs, Defendants' discriminatory policies caused damage to Plaintiffs, including, among other things, made them feel unwelcome, and like second-class citizens in their own home.

50. Defendants acted intentionally, willfully, and/or in reckless disregard of Plaintiffs' rights.

Count II: Discriminatory Terms and Conditions

51. Plaintiffs re-allege and incorporate paragraphs # 1-50 as if fully set forth herein.

52. The Fair Housing Act prohibits a housing provider from "[discriminating] against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the

provision of services or facilities in connection with such dwelling, because of a [disability] of that person; or . . . any person associated with that person." 42 U.S.C. § 3604(f)(2).

53. The Association created both the original assistance animal Policy and Revised Policy pursuant to the Declaration. As a condition of buying a unit in the building, Plaintiffs agreed to abide by the rules and regulations of the Association.

54. Defendants subjected the Greggs to discriminatory terms and conditions when, pursuant to their discriminatory original Policy and Revised Policy, they, *inter alia*: restricted which routes the Greggs can take in and out of the building with their assistance animal, restricted which places the Greggs' assistance animal can go within the building, and gave the Defendants the power to require that Mr. Gregg annually submit proof that he has a disability and needs his assistance animal.

55. Defendants' behavior caused damage to Plaintiffs. Subjecting Plaintiffs to discriminatory terms and conditions, among other things, made Plaintiffs feel like second-class citizens in their own home and made the Greggs feel monitored by staff and residents, and made them feel unwelcome.

56. Defendants acted intentionally, willfully, and/or in reckless disregard of Plaintiffs' rights.

Count III: Harassment Under the Fair Housing Act

57. Plaintiffs re-allege and incorporate paragraphs # 1-56 as if fully set forth herein.

58. Under the FHA, it is unlawful "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by [the Act]." 42 U.S.C. § 3617.

59. Defendants violated § 3617 of the Fair Housing Act when, (a) on several occasions, they fined the Greggs for taking Boo through the routes and in the elevators of their choice, and (b) forced them to use certain elevators and routes, making them feel like second-class citizens. Moreover, after the Greggs requested that Defendants change their rules to remove the discriminatory restrictions, Defendants changed the rules to make them <u>more</u> restrictive. Moreover, Defendants crafted rule changes that targeted the Greggs, such as requiring residents to pay for any accident by an assistance animal, even if cleaned up by the residents. Finally, continued to cite and fine the Greggs for utilizing the entrances and exits of their choice.

60. Defendants' discriminatory behavior caused damage to the Greggs. Defendants' behavior, among other things, made the Greggs feel like second-class citizens in their own home, made them feel monitored by staff and residents of the building, and forced them to use secondary routes in and out of the building.

61. Defendants acted intentionally, willfully, and/or in reckless disregard for the Plaintiffs' rights.

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Declare that Defendants' acts constitute discrimination under the Fair Housing Act. 42 U.S.C. § 3604(f)(3)(B);

B. Award Plaintiffs actual damages, including pain and suffering resulting from Defendants' illegal discrimination and a reimbursement of illegal fines imposed;

C. Award Plaintiffs punitive damages as a result of Defendants' willful, malicious, or reckless conduct;

D. Order Defendants to attend fair housing training and disability awareness training at Defendants' expense;

E. Order Defendants to revise their Service/Therapy Policy to comply with the Fair Housing Act;

F. Award Plaintiffs their reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c)(2); and

G. Grant any other relief this court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs request a trial by jury.

Dated: May 11, 2020                                   Respectfully Submitted,


                                                                      /s/ Mary Rosenberg
                                                                       One of the Attorneys for Plaintiff

Mary Rosenberg
Kenneth M. Walden
Charles Petrof
Access Living of Metropolitan Chicago
115 W. Chicago
Chicago, Illinois 60654
mrosenberg@accessliving.org
Phone: (312) 640-2155
Fax: (312) 640-2101